ORIGINAL

**UNITED STATES DISTRICT COURT** FILED
**FOR THE DISTRICT OF CONNECTICUT**

2004 APR 12  A 9: 08

| | |
|---|---|
| GOODSPEED AIRPORT, LLC, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| EAST HADDAM LAND TRUST, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |

U.S. DISTRICT COURT
BRIDGEPORT. CONN

Civil Action No. 3:01CV403SRU

### MEMORANDUM OF PLAINTIFFS IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS VENTRES AND MERROW

Plaintiffs Timothy Mellon and Goodspeed Airport LLC hereby file their memorandum in opposition to the motion for summary judgment of defendants Ventres and Merrow.

### Statement of the Case

A.  Plaintiffs' Purchase of Goodspeed Airport

The plaintiff Timothy Mellon is a citizen of the State of Connecticut who is a licensed pilot, who holds an Airline Transport Pilot license, which is the licensee for the highest skill level for pilots. (Mellon Decl. ¶ 1.)[1] Mr. Mellon is licensed to pilot all single and multi-engine land and sea planes under 12,500 pounds; and to pilot Boeing 727's and Cessna Citations which are over 12,500 pounds. (Id.) Mr. Mellon also holds a Commercial license to pilot helicopters and gliders. (Mellon Decl. ¶ 1.) Mr. Mellon is also the Chairman and Chief Executive Officer of Pan American Airways Corp. headquartered in Portsmouth, New Hampshire. (Mellon Decl. ¶ 1.)

Mr. Mellon is a member and owner of the plaintiff Goodspeed Airport LLC ("Goodspeed LLC"). (Mellon Decl. ¶ 2.) Goodspeed LLC is a limited liability company organized under the laws of the State of Connecticut. (Mellon Decl. ¶ 2.) On or about July 29, 1999, Goodspeed LLC

---

[1] Citations to the "Mellon Decl." are to the Declaration of Timothy Mellon filed herewith.

W02-DC:9JAP1\100016824.1

purchased the Goodspeed Airport from the Goodspeed Airport Development Corporation which was owned and controlled by Mr. Arthur D'Onofrio. (Mellon Decl. ¶ 3.) Goodspeed Airport was established in 1964 and is an airport in East Haddam, Connecticut licensed and regulated by the Connecticut Department of Transportation ("DOT") as the delegee of the Federal Aviation Administration ("FAA"), pursuant to federal laws and regulations promulgated by the FAA. (Mellon Decl. ¶ 3.) As a licensed pilot, Mr. Mellon has piloted airplanes to and from Goodspeed Airport scores of times. (Mellon Decl. ¶ 3.)

B.     The Airport's Historical Cutting of Trees on the EHLT Realty

In order to protect the safety of the traveling public and of individuals living or working in the vicinity of airports, FAA regulations require airport operators such as Goodspeed LLC to maintain clear, unobstructed navigable airspace in connection with the use of airport runways for the take-offs and landings. (Mellon Decl. ¶ 4.) Part 14, C.F.R. § 77.21(a) prohibits obstructions into the navigable airspace of the airport including objects of natural growth such as trees. (Mellon Decl. ¶ 4.) The regulations require a minimum of a 20:1 slope extending outward 200 feet from a point beyond the end of each active runway, which must be unobstructed. (Mellon Decl. ¶ 4.)

Since December 31, 1998, the East Haddam Land Trust ("EHLT") has been the owner of certain land to the south of and neighboring Goodspeed Airport (the "EHLT realty"). (Mellon Decl. ¶ 5; December 31, 1998 Quitclaim Deed, attached hereto as Exhibit 1.) From the inception of Goodspeed Airport in 1964, 34 years before the EHLT owned the realty, the operators and owners of the airport have entered upon this realty and trimmed and cut trees and vegetation, including clear cutting, that were obstructing or threatening to obstruct the navigable airspace of the airport. (Mellon Decl. ¶ 6 and Attachment C at ¶¶ 1-6.) This has been confirmed by historical aerial photographs of the airport and of the EHLT realty, by sworn testimony of public officials, by the

former owner of the airport, Mr. Arthur D'Onofrio, and by examination of the trees and tree stumps

on the EHLT realty. (Id.) Mr. D'Onofrio, who sold the airport to Goodspeed LLC, testified that for

the twenty years he leased or owned the airport, from 1979 through 1999, he regularly had the trees

on the EHLT realty cut whenever they interfered with the navigable airspace of the airport.

(D'Onofrio Dep. Tr. at 16-17, 39-40);[2] and that neither James Ventres nor anyone from the East

Haddam Inland Wetlands and Watercourses Commission ever told him that he needed an IWWC

permit to cut the trees. (D'Onofrio Dep. Tr. at 63.) Mr. D'Onofrio further testified that the owners of

the airport prior to him had cut the trees on the EHLT realty going back to the airport's inception.

(D'Onofrio Dep. Tr. at 17-20.)

C.    The Defendants' Misuse of State Power for Ulterior Motives to Further the Private
      Economic Interests of the GOH and the Town of East Haddam

Based on extremely restricted discovery, plaintiffs have been able to uncover an abuse of the

municipal powers of the Town of East Haddam ("Town") by defendants Merrow and Ventres to

further the economic interests of the Town and the Goodspeed Opera House ("GOH").[3] Goodspeed

Airport is adjacent to the GOH. During the relevant period, Ms. Merrow was the first selectperson of

the Town. (Ventres Dep. Tr. at 21.)[4] As firstselectperson, she was the chief executive officer of the

---

[2] References to the "D'Onofrio Dep. Tr." at are to excerpts from the transcript of the deposition of Mr. Arthur D'Onofrio annexed hereto as Exhibit 2.

[3] The Court has only allowed plaintiffs leave to take four depositions to date. In the joint status report submitted in January 2004, plaintiffs have requested leave to take additional depositions but the Court has not yet responded to plaintiffs' request. In addition to the four depositions taken in this case, plaintiffs have obtained and used herein transcripts of depositions taken in the State Court case pertaining to the state enforcement actions instituted against plaintiffs.

[4] References to the "Ventres Dep. Tr." are to excerpts from the transcript of the deposition of Mr. James Ventres annexed hereto as Exhibit 3.

Town. (Ventres Dep. Tr. at 22.) She believed it was her responsibility to grow the Town's economy. (Merrow Dep. Tr. at 20.)[5]

On or about February 28, 1998, the Town and the GOH joined together to develop an interdependent plan to revitalize the economy of East Haddam and to construct a new 650 seat theatre with actors' housing and parking. (Ventres Dep. Tr. at 45-46 and Ventres Dep. Exs. 3, 4 and 5, attached hereto as Exhibits 5, 6, and 7 respectively.) By March 25, 1998, a "project team" of Susan Merrow, Mr. Ventres and Todd Little of the GOH met with the Department of Economic and Community Development ("DECD") to obtain assistance and explain the "interdependent plan." (Exhibit 5.) The "interdependent plan," included constructing a wild life refuge at the site where Goodspeed Airport sits. (Exhibit 5.) The plan also called for "increasing parking twofold to accommodate new businesses and facilities." (Id.) The plan also included the Town selling its office downtown and moving the Town office elsewhere in order to create more commercial space in the Town. (Merrow Dep. Tr. at 17, 20-22.) Ms. Merrow told Mr. Ventres to attend the DECD meeting. (Merrow Dep. Tr. at 36.) She believed the GOH/Town project was central to Mr. Ventres' job. (Id.) During the course of the project, she asked Mr. Ventres to do things to move this project. (Id.)

Ms. Merrow realized that success of a business in the Town was "inextricably linked to the availability of parking." (Merrow Dep. Tr. at 67.) She also recognized in a letter to the editor that expansion of the GOH as well as expansions of the businesses on the main street in the Town required her to find convenient parking. (Ventres Dep. Tr. at 13.) She assigned Mr. Ventres the job of actively looking to see how parking could be accommodated; he reported back to her. (Merrow Dep. Tr. at 52.)

---

[5] References to the "Merrow Dep. Tr." at are to excerpts from the transcript of the deposition of Ms. Susan Merrow annexed hereto as Exhibit 4.

According to Ms. Merrow, the Town had since 1996, and before considered ways to make improvements in the Town's main street to make it more commercially viable. (Merrow Dep. Tr. at 17-18.) Ms. Ventres was leading these efforts. (Id.) She and Mr. Ventres believed main street had to be changed to allow room for more businesses. (Merrow Dep. Tr. at 21, 22, 25, 29-31.) GOH owned several houses on main street. (Id.) If the GOH plans went forward, these houses would be open to the Town for new businesses. (Id. and Exhibit 5.) And, if the Town moved out of its offices on main street, the Town offices could be open for new businesses. (Id.) She admitted the success of the Town's plans were dependent on the success of the GOH plans. (Merrow Dep. Tr. at 45.) Merrow testified the GOH/Town project team was a core group of people, including herself, Mr. Ventres, Mr. Little and, later, Bill Kotchen from the GOH. (Merrow Dep. Tr. at 41-43.) The group periodically met, kept track of the project, moved the project along and reported to one another about progress of the project. (Merrow Dep. Tr. at 41-43.) She described it as a "very collaborative" project. (Merrow Dep. Tr. at 39.) She attended the core groups meetings. (Merrow Dep. Tr. at 43.)

The GOH/Town project team met about once per month to move the project along, (Ventres Dep. Tr. at 40-43.) Mr. Ventres acted as a go-between among all of the constituents needed to make the project succeed. (Portley Dep. Tr. at 21, 23, 26[6]; Ventres Dep. Tr. at 40-41.) The GOH and Ms. Merrow presented Mr. D'Onofrio with a plan for the GOH to purchase part of the airport's property for GOH parking. (D'Onofrio Dep. Tr. at 74-75.) Mr. D'Onofrio felt continuous behind the scenes pressure from the Town to furnish the GOH with some type of parking arrangement on the airport property. (D'Onofrio Dep. Tr. at 77.) Ms. Merrow was aware that the GOH/Town project would require hundreds of parking spaces. (Merrow Dep. Tr. at 49-51.) She knew the airport could

---

[6] References to the "Portley Dep. Tr. at are to excerpts from the deposition of James Portley annexed hereto as Exhibit 8.

accommodate the parking needs. (Id.) And she asked Mr. Ventres to take care of the parking issue. (Merrow Dep. Tr. at 49-52.) Ms. Merrow was aware in 1998 that GOH wanted to buy the airport, and believed this was good for the project. (Merrow Dep. Tr. at 72-74, 77.) She told Mr. Ventres her views. (Id.) Mr. Ventres was aware that GOH wanted to buy the Goodspeed Airport, among other things, to satisfy its parking needs. (Ventres Dep. Tr. at 63, 82-83.) There is no question the Town and GOH expected to meet its parking requirements with the use of the airport property.

On April 13, 1998, the DECD reported to "the Town and GOH Project Team" regarding the status of the project. (Exhibit 6.) On August 18, 1998, Ms. Merrow wrote to the Board of GOH to confirm the Town's complete involvement and participation in the joint project. (Exhibit 7.) Ms. Merrow's letter confirms that "for several months now we have been working together and that the Town and GOH shared 'intertwined futures.'" (Id.)

By March 1999, GOH, with the knowledge of Mr. Ventres, was meeting with the Governor's Office to obtain a commitment for the project. (Ventres Dep. Tr. at 82-83 and Ventres Dep. Ex. 7, attached hereto as Exhibit 9.) Following the meeting with the Governor's Office, the GOH requested Ms. Merrow to do certain things to help obtain wider political support. (Ventres Dep. Ex. 8, attached hereto as Exhibit 10.) Pursuant to this request, Ms. Merrow wrote to the Governor's Office on March 18, 1999, that GOH "is a major force for the good of our economic base" and that GOH and the Town "jointly signed the enclosed Memorandum of Understanding which shows our mutual concern for growth and expansion." (Ventres Dep. Ex. 9, attached hereto as Exhibit 11.) According to Mr. Ventres, this was the only time he could recall that the Town entered into a Memorandum of Understanding with a private party. (Ventres Dep. Tr. at 73-74.)

Additional parking was an absolute necessity if the GOH/Town project were going to be a success. (Ventres Dep. Tr. at 46 and Ventres Dep. Ex. 13, attached hereto as Exhibit 12; Merrow

Dep. Tr 67.) In his role as point man for the project Mr. Ventres in May 1999, informed GOH that Mr. D'Onofrio had obtained a better offer from another party (Mellon) for the purchase of the airport. (Ventres Dep. Ex. 11, attached hereto as Exhibit 13.) In a GOH memo, the author reports on a conversation with Mr. D'Onofrio, who said that, "he felt a great deal of pressure from the Town" to close the deal with GOH. (Id.)

Mr. Mellon's purchase of the airport upset the GOH/Town project. After Mr. Mellon bought the airport, the core group met to discuss the change and how it affected the parking issue. (Merrow Dep. Tr. at 104.) Ms. Merrow agreed to find out from Mr. Mellon about his willingness to provide parking. (Id.) When it bought the airport, Goodspeed LLC had plans to reorient and lengthen the runways at the airport, which would require that Goodspeed LLC obtain from the EHLT the right to cut trees on the EHLT realty in an area larger than the area that had been historically clear cut. (Mellon Decl. ¶ 8.) In her meeting with Mr. Mellon, which is the only time she met Mr. Mellon, Ms. Merrow told Mr. Mellon about the GOH/Town plans and the need for parking. (Merrow Dep. Tr. at 81-83.) Mr. Mellon indicated a willingness to help, if the Town and EHLT would help him in getting his plans to reorient the runway implemented, including cutting on the EHLT land; she asked if helping with the parking and the approval of Mr. Mellon's plans for the airport were a "quid pro quo." (Merrow Dep. Tr. at 81-83; Mellon Decl. ¶ 8.) Mr. Mellon responded that it was. (Mellon Decl. ¶ 8; Merrow Dep. Tr. at 81-83.)

Ms. Merrow's husband was a member of the Board of EHLT and its treasurer. (Merrow Dep. Tr. at 95-96.) She recognized she could not speak for the EHLT; however, she carried Mr. Mellon's message back to her husband. (Merrow Dep. Tr. at 95-96.) She told her husband that Mr. Mellon was willing to help with the parking spaces, but he wanted something from the EHLT. (Merrow Dep. Tr. at 97.) After that, she kept her husband informed about how the project was going.

(Merrow Dep. Tr. at 99.)  Also, following her meeting with Mr. Mellon, she carried back Mr. Mellon's message to the core group. (Merrow Dep. Tr. at 103.) She also reported separately to Mr. Ventres the substance of her meeting with Mr. Mellon.  (Merrow Dep. Tr. at 106.)

Ms. Merrow confirmed her meeting with Mr. Mellon in a letter to the editor of the local newspaper.  (Ventres Dep. Ex. 13, attached hereto as Exhibit 14.)  She stated she met with Mr. Mellon and they discussed his plans and "opportunities to work together … to see if other Village needs – including expanded parking facilities to potentially serve a second theater – can be accommodated at the airport." (Id.) She further stated "we are willing to help move his plans along." (Id.)

Mr. Mellon retained a professional engineer, Mr. James Portley, who is the town engineer for the Town of Guilford, to prepare a master plan for the development of the airport. (Portley Dep. Tr. at 7-9.) At Mr. Mellon's direction, Mr. Portley prepared a lay-out of potential parking on the airport's property for the GOH that would assist the GOH in maximizing parking on the airport's property. (Portley Dep. Tr. at 9-10.)

After the airport was purchased by Mr. Mellon, Mr. Ventres continued as the pivot man for communicating among Mr. Mellon, the EHLT and GOH. (Mellon Decl. ¶ 9.) Ms. Merrow reported back to Mr. Ventres on her discussions with Mellon and on Mellon's request for a quid pro quo. (Merrow Dep. Tr. at 101.)  Mr. Ventres recommended to Mr. Mellon that he deal with Ann Kilpatrick, a board member of EHLT.  (Ventres Dep. Tr. at 152.)  Mr. Ventres also talked to Kilpatrick about Mr. Mellon and the GOH parking issues. (Ventres Dep. Tr. at 152.) Ms. Kilpatrick considered Mr. Ventres the communicator between Mr. Mellon and the Land Trust. (Kilpatrick Dep. Tr. at 27.)[7]

---

[7] Citations to the "Kilpatrick Dep. Tr." are to excerpts from the deposition of EHLT member Ann Kilpatrick

Mr. Ventres met with Mr. Mellon at the airport's property to discuss the GOH's parking needs and suggested that a hanger at the airport be taken down and the space used for GOH parking. (Ventres Dep. Tr. at 135-136.) Mr. Ventres reported back to the GOH on his discussions with Mr. Mellon. (Ventres Dep. Tr. at 136-137.) Mr. Ventres also reported the discussions between Mr. Mellon and the GOH and the EHLT. (Ventres Dep. Tr. at 140.)

In March 2000, there was a meeting on the airport's property between Mr. Mellon, Mr. Portley, Mr. Ventres, and Mr. William Kotchen, of the GOH, to discuss how the Town and the GOH could obtain access to the airport's property to expand the GOH's parking. (Portley Dep. Tr. at 18-19.) There were also discussions at this meeting about obtaining an agreement from the EHLT for the airport to cut trees on the EHLT realty. (Portley Dep. Tr. at 22-23.) Mr. Ventres was acting as the go-between between the Town, the GOH, Goodspeed Airport and the EHLT. (Portley Dep. Tr. at 21, 23, 26.) At that meeting, Mr. Ventres made no statement that any IWWC permits would be necessary for the cutting of trees on the EHLT realty. (Portley Dep. Tr. at 23.)

D.    The Airport's Receipt of the FAA 5010 Report

In the midst of these discussions, Goodspeed Airport was subject to an FAA inspection known as a 5010 inspection. (Mellon Decl. ¶ 11.) The 5010 inspection was conducted in the summer of 1999 on behalf of the FAA by the Transportation Supervising Airport Engineer for the Bureau of Aviation and Ports of the Connecticut DOT ("Bureau of Aviation"). (Mellon Decl. ¶ 11.) Even prior to the 5010 inspection, Mr. Mellon had informed Mr. Ventres that certain trees on the airport's property obstructed the navigable airspace of the airport and would have to be cut down. (Mellon Decl. ¶ 11.) Mr. Ventres told Mr. Mellon that the only authority Goodspeed LLC needed to cut trees to conform with FAA safety regulations was a letter from the Connecticut DOT. (Mellon

annexed hereto as Exhibit 15.

Decl. ¶ 11.)  Mr. Ventres never represented to Mr. Mellon that Goodspeed LLC needed a permit from the East Haddam IWWC in order to cut down trees. (Mellon Decl. ¶ 11.)  The trees on the airport realty are part of the same wetlands as are the trees on the neighboring EHLT realty. (Mellon Decl. ¶ 11.)

On September 1, 1999, the Bureau of Aviation issued its 5010 report. (Mellon Decl. ¶ 12.) The 5010 report indicated that the tree line on a portion of the EHLT realty was obstructing the airport's navigable airspace in violation of the FAA's regulations and "should be removed as soon as possible." (Mellon Decl. ¶ 12.)  The 5010 report further identified trees on the airport's own property that were obstructing the airport's navigable airspace. (Mellon Decl. ¶ 12.)

In September 1999, Mr. Mellon sent Mr. Ventres a copy of the 5010 report with a handwritten note indicating that Goodspeed LLC was going to cut the designated trees on the airport's realty. (Mellon Decl. ¶ 13 and Attachment B.)  In accordance with Mr. Mellon's earlier discussions with Mr. Ventres, Mr. Ventres made no objection to the tree cutting. (Mellon Decl. ¶ 13.) In particular, Mr. Ventres never required that Goodspeed LLC obtain a permit from the East Haddam IWWC for the cutting. (Mellon Decl. ¶¶ 13, 28.) Mr. Ventres admitted that cutting of trees in a wetlands was not in and of itself a prohibited "regulated activity" prohibited without a permit. (Ventres Dep. Tr. at 149.)  Rather, whether the cutting of trees constituted regulated activity depended upon numerous factors including the frequency, type and amount of cutting, the soil type, the level of water and the function of the wetlands. (Ventres Dep. Tr. at 149-151.) Mr. Ventres testified that, as IWWC enforcement officer, he had the authority to determine that an IWWC permit was not necessary for tree cutting depending upon the specific facts and circumstance of a particular case. (Id.)

Shortly thereafter, in September 1999, Goodspeed LLC cut and trimmed the trees on the airport's property in accordance with the 5010 report. (Mellon Decl. ¶ 13.) Since Goodspeed LLC was in discussions with the EHLT on the subject of obtaining an easement to cut trees on the larger portion of the EHLT realty necessary for the airport's expansion plans, the cutting of trees on the EHLT realty was temporarily held in abeyance. (Mellon Decl. ¶ 13.)

Mr. Mellon also informed Mr. Ventres that Goodspeed LLC intended to clear cut trees on the EHLT realty. (Ventres Dep. Tr. at 152-153.) Mr. Mellon notified the EHLT of the 5010 report regarding the need to cut and trim trees on the EHLT realty. (Mellon Decl. ¶ 14.) In his meetings with the EHLT, Mr. Mellon expressly discussed the need to cut and trim trees on the EHLT realty. (Mellon Decl. ¶ 14.) In November 1999, Mr. Ventres and EHLT representatives walked the EHLT realty to view the area to be cut. (Mellon Decl. ¶ 14.) The memorandum documenting the site visit by Mr. Ventres expressly notes that "The majority of the Land Trust property further to the east is also floodplain forest that has been historically stump cut to heights approximately 2 to 3 feet above the ground. (Exhibit 16, attached hereto.) It appeared that Mr. Mellon's plans were moving forward without a hitch.

E.    The GOH's Rejections of Mellon's Parking Proposal and the Retaliatory Change of Position by the EHLT

As late as February 3, 2000, the combined GOH/Airport/EHLT part of the project was moving along. (Ventres Dep. Ex. 18, attached hereto as Exhibit 17.) Mr. Ventres was orchestrating the progress. (Id.) On March 26, 2000, Mr. Mellon met with Mr. Ventres and the GOH to discuss the use of the airport's property for GOH parking and Goodspeed LLC's need to secure expanded tree cutting rights on the EHLT realty for the airport's planned runway expansion and realignment. (Ventres Dep. Tr. at 175-178.) Mr. Mellon expressly told Mr. Ventres that Mr. Mellon wanted to cut

down all the trees in the affected portion of the EHLT property. (Ventres Dep. Tr. at 177.)

Mr. Ventres and the GOH encouraged Mr. Mellon to supply the GOH with a written list of specific

terms and conditions for the GOH's use of the airport property for parking. (Mellon Dep. Tr. at 61.)[8]

In the March 26th meeting, Mr. Mellon informed GOH and Mr. Ventres of Mr. Mellon's terms for

parking at the airport. (Ventres Dep. Ex. 19, attached hereto as Exhibit 19.) On March 29, 2000,

Mr. Mellon followed up with draft terms and conditions for use by the GOH of the airport's land for

parking. (Mellon Decl. ¶ 15.) The first two conditions precedent listed by Goodspeed LLC to any

agreement with the GOH on parking reflected Mr. Mellon's experience in dealing with Mr. Ventres

and the GOH through March 2000:

> Conditions Precedent to Lease:
>
> (1) Agreement satisfactory to Goodspeed Airport, LLC with the East
> Haddam Land Trust with respect to securing the air rights, vegetation
> control rights, and farming rights to that certain parcel of land directly
> to the South of the airport;
>
> (2) All necessary governmental approvals with respect to the
> proposed extension and re-alignment of the airport runway, taxiways,
> and buildings as proposed in the Goodspeed Airport Plan.

(Ventres Dep. Ex. 20, attached hereto as Exhibit 20.) Mr. Mellon was led to believe all those issues

were intertwined and dependent. The proposed terms and conditions also required the GOH to pay

for the parking rights. The cost was not acceptable to the GOH. (Mellon Decl. ¶ 15, see also,

Exhibit 19.)

Mr. Mellon had begun discussing a clearing easement with the EHLT in 1999. By letter of

September 28, 1999, Mr. Mellon enclosed a "clearing easement" for EHLT's property to Heidi

Fellner, a board member of the EHLT with whom he originally began discussions. (Ventres Dep.

---

[8] Citations to the "Mellon Dep. Tr." are to the excerpts from the deposition of Mr. Mellon annexed hereto as
Exhibit 18.

Ex. 16, attached hereto as Exhibit 21.) The discussions since September 1999 were all addressed to an easement. On April 4, 2000, Mr. Mellon met with individual representatives of the EHLT. Much to his shock and dismay, the EHLT representatives at this meeting took the position, for the first time, that it would not formalize an enlarged easement but, instead, would only consider granting a license to cut trees, and for the first time, demanded payment for the so-called license. (Mellon Decl. ¶ 16.)

According to Maureen Vanderstad the change in the EHLT's position occurred between February and March. (Vanderstad Dep. Tr. at 135-137.)[9] This is when Mr. Ventres met with the EHLT committee which was negotiating with Mr. Mellon (Kilpatrick Dep. Tr. at 1, 15-20.) The committee included Arthur Merrow, Ms. Merrow's husband. (Kilpatrick Dep. Tr. at 41.) Mr. Ventres admitted that he suggested to Ms. Kilpatrick that if Mr. Mellon were going to insist on a license with a fee for the GOH parking, Mr. Mellon was in no position to complain about the EHLT similarly requesting a license with a fee (Ventres Dep. Tr. at 201-202; Kilpatrick Dep. Tr. at 31-32.)

Mr. Mellon rejected the EHLT's new proposal for several reasons. (Mellon Decl. ¶ 17.) First, Goodspeed LLC, by virtue of the historical cutting and trimming of trees on the EHLT realty, already had the right to cut and trim trees on that portion of the EHLT realty that had historically been cut, and was under no financial obligations to the EHLT in that regard. (Mellon Decl. ¶¶ 6, 17 and Attachment C at ¶¶ 1-6.) Second, there had been no prior discussions whatsoever concerning a financial payment to the EHLT and no discussions for a license. The EHLT's new demand followed on the heels of Goodspeed LLC's request that the GOH pay for parking rights on the airport's property. (Mellon Decl. ¶ 17.) Third, Mr. Mellon was offended by the shakedown by the EHLT for

---

[9] References to the "Vanderstad Dep. Tr." at are to excerpts from the transcript of the deposition of Maureen Vanderstad annexed hereto as Exhibit 22.

money by taking advantage of the 5010 report and of the urgent need to cut and trim trees because of the significant danger they posed to the airport's navigable airspace and to the public. (Mellon Decl. ¶ 17.)

Negotiations between Mr. Mellon and the Land Trust continued through Summer 2000. Mr. Mellon submitted another clearing easement to the Land Trust and it was returned by Ms. Vanderstad with a letter dated June 5, 2000. (Ventres Dep. Ex. 21, attached hereto as Exhibit 23.) Mr. Ventres received a copy of the June 5, 2000 letter on or about that date. (Ventres Dep. Tr. at 184.) After he got the letter he talked with Kilpatrick and probably other EHLT Board members about softening their position with Mr. Mellon. (Ventres Dep. Tr. at 194.) On June 12, 2000, approximately one week after he received the June 5, 2000 letter, Mr. Ventres faxed a written note to Mr. Mellon on East Haddam selectman's stationary stating:

> This (June 5) letter does not represent the entire Board of Directors intention. Expect a second letter.

(Ventres Dep. Ex. 22, attached hereto as Exhibit 24.) Mr. Ventres also contacted Ms. Kilpatrick of the EHLT to inform her that Mr. Mellon was upset about the EHLT's new position. (Vanderstad Dep. Tr. at 152.)

During April 2000, the GOH again contacted Mr. Mellon to discuss the proposed terms and conditions for the GOH's use of the Airport realty for parking. (Mellon Decl. ¶ 18.) Mr. Mellon told the GOH that it was futile to discuss the parking issues so long as the EHLT was now insisting on only granting Goodspeed Airport LLC a license and was insisting on financial payments. (Mellon Decl. ¶ 18.)

F.    The EHLT's Agreement to a Tree Clearing Easement that was Never Communicated to Mr. Mellon

In 2000, Mr. Mellon repeatedly told Ms. Kilpatrick that Goodspeed LLC had the legal right to continue to clear cut the area on the EHLT realty that had been historically stump cut regardless of whether he had the EHLT's consent.  (Kilpatrick Dep. Tr. at 87-88.)  In November 2000, Ms. Kilpatrick, put together for the EHLT Board draft terms and conditions for the cutting of trees by Goodspeed LLC on the EHLT realty.  (Kilpatrick Dep. Tr. at 100-101; Ventres Dep. Ex. 23, attached hereto as Exhibit 25.)  Ms. Kilpatrick testified that her draft reflected the decisions made by the EHLT board at its October 18, 2000 board meeting.  (Kilpatrick Dep. Tr. at 98-101.)  The draft acknowledges that the area to be cleared "includes an area that has been historically stump cut for safety purposes..."  (Exhibit 25.)  The draft further provides for clear cutting:

> All Tree-of-Heaven, Maples and Elms will be cut at their base and the stumps treated with an approved herbicide.
>
> *   *   *
>
> Following tree removal and stump treatment, the middle portion of the area will be seeded and/or planted with a mix of herbaceous species.

The draft further provides:

> Maintenance/Monitoring Requirements:  The site will be maintained primarily in a grassy/herbaceous state by mowing once a year using a tractor and bush hog during dry conditions  (August ?).

(Exhibit 25.)  This EHLT draft, while reflecting Mr. Mellon's insistence on the clear cutting of trees, was never furnished to Mr. Mellon or to Goodspeed LLC.

G.    Plaintiffs' Cutting of Trees on the EHLT Realty and the Defendants' Bad Faith Misuse of State Process to Retaliate Against Plaintiffs

The delay in cutting trees on the EHLT realty placed Goodspeed LLC under mounting pressure because the trees on the EHLT realty were obstructing the navigable airspace of the airport

and endangering the public. (Mellon Decl. ¶ 19.) When conditions became so dangerous he could not wait longer, Mr. Mellon filed the affidavit of the airport's former owner, Mr. D'Onofrio, in the Land Records of the Town of East Haddam in the title section thereof for the EHLT realty, and mailed Mr. D'Onofrio's affidavit to the EHLT. (Mellon Decl. ¶ 19.) Mr. D'Onofrio's affidavit attested to the airport's historical cutting and trimming of trees on the EHLT realty and confirmed Goodspeed LLC's prescriptive easement to cut and trim trees on the realty. (Mellon Decl. Attachment C, D'Onofrio Aff. at ¶¶ 1-6.)

In December 2000, Mr. Mellon arranged to have a contractor cut the trees on that portion of the EHLT realty that had been historically cut by the airport owners since the mid-1960's and that were obstructing the navigable airspace of the airport. (Mellon Decl. ¶ 21.) Goodspeed also had cut several trees on an adjacent property owned by the Nature Conservancy on areas on that property that interfered with the navigable airspace of the airport and which had been historically cleared by the owners of the airport. This cutting of trees was fifteen months after the issuance of the September 1, 1999, 5010 report directing that the offending trees "should be removed as soon as possible."

Mr. Mellon's decision to cut the trees on the EHLT property on the basis of the historical easement deprived Mr. Ventres of his leverage to get Mr. Mellon to give parking to GOH. Mr. Ventres had to regain his leverage over Mr. Mellon, and misused the powers of his office to bring Mr. Mellon back into line. As Mr. Ventres began his vindictive, retaliatory campaign, the GOH wrote Mr. Mellon asking to continue discussions on parking. (Merrow Dep. Ex. 1, attached hereto as Exhibit 26.)

Mr. Ventres urged interested parties to file a criminal complaints against Mr. Mellon. (Frohling Dep. Tr. at 65-66; Ventres Dep. Ex. 24, attached hereto as Exhibit 28.)[10] The EHLT, in

----

[10] Citations to the "Frohling Dep. Tr." are to excerpts from the deposition transcript of Nature Conservancy

fact, filed a criminal complaint against Mr. Mellon with the Connecticut State police. (Vanderstad

Dep. Tr. at 50-51.) Mr. Ventres and Ms. Merrow both gave the police interviews. (Ventres Dep. Ex.

26, attached hereto as Exhibit 29.) Mr. Ventres instigated their criminal complaints despite the fact

he knew this area of EHLT's property had been historically stump cut since the airport began.

Defendant Merrow made the following statements published in The Middletown Press:

> Speaking for the East Haddam Land Trust, which owns the property
> with the Nature Conservancy, First Selectwoman Sue Merrow said
> the matter has been turned over to state police.
>
> "We believe this was criminal activity," Merrow said.

(Vanderstad Dep. Ex. 28, attached hereto as Exhibit 30; emphasis supplied.)

Defendant Merrow also made the following statement to The Hartford Courant:

> State police are investigating a criminal complaint filed by the land
> trust, seeking larceny and trespassing charges.
>
> First Selectwoman Susan Merrow said she was informed by state
> police Wednesday that the criminal investigation has not concluded.
>
> "It's ongoing, it's complicated and they are taking their time to do it
> right," Merrow said, noting that the community is shocked by
> Mellon's action.

(Merrow Dep. Ex. 2, attached hereto as Exhibit 31.) Ms. Merrow admitted that her statements to the

press publicly accusing Mr. Mellon of criminal activity were going to hurt Mr. Mellon's reputation.

(Merrow Dep. Tr. at 199.)

By criminal activity, Ms. Merrow meant that Mr. Mellon had trespassed on EHLT's property

and cut trees. (Merrow Dep. Tr. at 151-152.) However, Ms. Merrow admitted she was aware of the

D'Onofrio Affidavit, and she did not know if it was accurate. (Merrow Dep. Tr. at 147.) She did not

know if prior owners of the airport had entered this same property and trimmed and cut trees.

member Nathan Frohling annexed hereto as Exhibit 29.

(Merrow Dep. Tr. at 155.)  She knew about prescriptive easements but did not know if it applied here.  (Merrow Dep. Tr. at 157.)  Based on these facts, Ms. Merrow's statements about criminal activity were malicious and intended to cause injury.  No criminal charges were ever instituted against Mr. Mellon.  Yet, Ms. Merrow still believes Mr. Mellon committed a crime, but the law enforcement authorities simply allowed him to violate the law with impunity.  (Merrow Dep. Tr. at 160.)

Immediately after the trees were cut, Mr. Mellon's engineer, Mr. Portley, went to the IWWC to submit the airport's plans for the runway reorientation and lengthening.  (Portley Dep. Tr. at 38-39.)  Mr. Portley encountered Mr. Ventres, who was "extremely upset" and whose emotions were "high" about the tree cutting.  (Portley Dep. Tr. at 41, 58.)  Mr. Ventres instructed Mr. Portley to not even submit the application to the IWWC at that time even though it encompassed an area that was different than the area where the trees were cut.  (Portley Dep. Tr. at 41-42.)

Immediately after the cutting, Mr. Ventres, in his capacity as Enforcement Officer of the Town of East Haddam IWWC, issued a verbal cease and desist order to Goodspeed LLC.  (Mellon Decl. ¶ 21.)  Contrary to his earlier representations to Mr. Mellon that the only authority needed to cut trees was a letter from the Connecticut DOT, Mr. Ventres now took the position, for the first time, that Mr. Mellon's cutting of trees was a "regulated activity" which could not be conducted without a permit from the IWWC.  (Mellon Decl. ¶ 21.)  Mr. Ventres' new position was contrary to his discussions with Mr. Mellon when Mr. Mellon informed him that Goodspeed LLC was going to cut the trees on the airport's property in response to the 5010 report and when Goodspeed LLC proceeded to cut the trees.  (Mellon Decl. ¶ 21.)

Mr. Ventres, unbeknownst to Mr. Mellon at the time, also scheduled the issuance of a written cease and desist order on the agenda for the IWWC meeting to be held on December 19, 2000.

(Mellon Decl. ¶ 22.) Mr. Ventres notified the president of the EHLT on December 4, 2000, that the cease and desist order would be on the agenda for the December 19, 2000 meeting. (Exhibit 32, attached hereto.) At no time was Goodspeed LLC notified that the cease and desist order was on the agenda for the December 19, 2000 IWWC meeting. (Mellon Decl. ¶ 22.) Goodspeed LLC was deprived of any notice or opportunity to be heard at the December 19, 2000 IWWC meeting. (Mellon Decl. ¶ 22.)

Thus, Mr. Ventres made sure that EHLT representatives were going to attend the December 19, 2000 IWWC hearing, but purposefully decided not to notify Goodspeed LLC or Mr. Mellon. (Ventres Dep. Tr. at 220.) The transcript of the December 19th hearing indicates that Mr. Ventres did not inform the IWWC of his prior representations to Mr. Mellon that the only authority that Goodspeed LLC needed to cut trees was a letter from the DOT. (Mellon Decl. ¶ 23 and Attachment D.) In addition, the transcript indicates that Mr. Ventres left uncorrected, Ms. Vanderstad's lies[11] to the IWWC when she stated, among other things, that trees had not been cut on the EHLT realty since the 1800's, and when she stated that clear cutting of trees had never been an option and that the EHLT had told plaintiffs that clear cutting was not an option. (Mellon Decl. Attachment D at pp. EHLT 135-136.) Mr. Ventres knew both these statements were false. See, supra. Had Mr. Ventres truthfully informed IWWC that: (1) the area cut by Mr. Mellon had historically been stump cut by owners of the airport; (2) in fact, the EHLT and Mr. Mellon had discussed clear cutting and, the EHLT Board had agreed among itself to allow clear cutting; and (3) Mr. Ventres had told Mr. Mellon previously he could cut the trees with the 5010 report, the IWWC would not have entered a cease and desist order. Mr. Ventres admitted that it was wrong to allow the EHLT representatives to make these statements at the ex parte December 19, 2000 IWWC hearing. (Ventres Dep. Tr. at 237.)

---

[11] Ms. Vanderstad at this time was president of the EHLT.

Contrary to Ms. Vanderstad's misrepresentations, the EHLT representative Ann Kilpatrick with whom Mr. Mellon had been negotiating, testified that no one from the EHLT ever told Mr. Mellon that the EHLT was not going to allow him to clear cut trees on the EHLT realty because that was one of the things the EHLT was actively considering. (Kilpatrick Dep. Tr. at 71-72.) Moreover, she had prepared an agreement for the EHLT Board that permitted clear cutting. See, supra.

At the end of the December 19, 2000 meeting, the IWWC approved the issuance of a written cease and desist order. (Mellon Decl. ¶ 24 and Attachment E.) Because Goodspeed LLC was deprived of its rights of notice and an opportunity to be heard, the cease and desist order was issued ex parte, and was issued on the basis of material misrepresentations and omissions of fact. (Mellon Decl. ¶ 24.) The cease and desist order purports to prohibit Goodspeed LLC from engaging in any regulated activity, including the cutting of trees, on both the Airport's own property and on the EHLT realty. (Mellon Decl. Attachment E.)

The IWWC scheduled a hearing on the ex parte cease and desist order on January 11, 2001 and the hearing was continued on February 28, 2001. (Mellon Decl. ¶ 25.) There were five members of the IWWC present at the February 28, 2001 hearing. (Mellon Decl. ¶ 25.) Three of the members, however, recused themselves on the advice of their counsel because of conflicts of interest because they were members of the EHLT or had bias against Mr. Mellon and Goodspeed LLC. This left the IWWC without a quorum. (Mellon Decl. ¶ 25.)

At the February 28, 2001 hearing, the IWWC gave Goodspeed LLC "the option" of waiving its objections to the conflicts of interest of the recused members and proceeding with the five member IWWC including the three conflicted members. (Mellon Decl. ¶ 26.) When Goodspeed LLC refused to proceed with a tainted, biased tribunal, the IWWC closed the meeting on the cease and desist order. (Mellon Decl. ¶ 26.) However, the IWWC thereafter re-seated the three recused

members, and, with this tainted quorum, voted to institute an action in the Superior Court against Goodspeed LLC. (Mellon Decl. ¶ 26.) The IWWC took no action vacating, affirming or modifying the ex parte cease and desist order. (Mellon Decl. ¶ 26.)

Thus, the ex parte cease and desist order remains in place and purports to prohibit Goodspeed LLC from conducting any regulated activity on either the airport's property or on the EHLT realty. (Mellon Decl. ¶ 27 and Attachment E.) Goodspeed LLC was never afforded notice or an opportunity to be heard on its issuance, and was never afforded a hearing before the IWWC on its continued existence because the IWWC simply left the cease and desist order in place with no IWWC review of the order. (Mellon Decl. ¶ 27.)

Mr. Merrow continued her vindictive and illegal conduct after Mr. Mellon was sued by the Town. On March 7, 2001, Ms. Merrow wrote a letter to David Leff, Deputy Commissioner of the Connecticut Department of Environmental Protection ("DEP") requesting that the DEP undertake several actions against Mr. Mellon, many of which were illegal and highly improper. Her letter is also filled with lies. For example, she states in the letter Mr. Mellon clear cut the trees so he could land his private jet plane at the airport. (Merrow Dep. Tr. at 164 and Dep. Ex. 3, attached hereto as Exhibit 33.) In her deposition, she admitted she did not know one way or the other about Mr. Mellon's jet plane, and she was just guessing. (Merrow Dep. Tr. at 165.) Again, she claimed in the letter that the area cut by Mr. Mellon had only been selectively trimmed in the past and many of the trees were 30 to 45 years old. (Merrow Dep. Tr. at 169-170 and Exhibit 33, p. 3, ¶ 3.) After being shown a number of documents, some created by the EHLT and Nature Conservancy that indicated this same area had been historically stump cut to two or three feet above the ground, Ms. Merrow admitted she would not have written the claim without further investigation. (Merrow Dep. Tr. at 173-175.)

The Merrow letter also requests the DEP to use its access to media to damage Mr. Mellon and to force him to the table:

> 6. The DEP could and should use its superior access to the media to bring public pressure to bear on Mr. Mellon. From what we have heard, Mr. Mellon has styled himself as an environmentalist and wants to be perceived favorably by the public in general and the residents of the Connecticut coast in particular (he has a home in Lyme). A strong public stance by the DEP, and good press coverage, could do more to bring Mr. Mellon to the table than any other single action we could take.

(Exhibit 33, attached hereto.)   Ms. Merrow testified she made this request to DEP Deputy Commissioner Leff because "I was wanting him to use superior access to the media to bring pressure to bear on Mr. Mellon to come to the table." (Merrow Dep. Tr. at 178.)

She also asked Leff to use his "good offices" with the DOT, Aviation Division, to commence "any enforcement action" and "a prompt from the DEP would give the matter a high priority." (Exhibit 33, ¶ 4.)  Her request is reminiscent of President Nixon's "enemies list" which the IRS dutifully investigated. Ms. Merrow believes this is appropriate. (Merrow Dep. Tr. at 86.)

The facts in this case[12] show an egregious abuse of state office and power. The Town had a direct financial interest in the success of GOH's plans; without GOH's success, the Town's commercial development would have remained stagnant. The Town needed to get parking for GOH, and was pressing the former airport owner to provide it or to sell the airport to GOH. Mr. Mellon's purchase of the airport upset the applecart. As long as Mr. Mellon appeared to be willing to provide parking at the airport for no charge, Mr. Mellon's plans were moving along. As soon as he made a parking offer unacceptable to GOH, Mr. Mellon's progress was stopped in its tracks. Mr. Ventres

---

[12] Plaintiffs have been severely prejudiced in their ability to develop fully the facts supporting their claims because they were restricted to four depositions and no third party discovery, i.e., from the GOH, from the DECD, etc.

and the EHLT changed positions and denied prior commitments. When Mr. Mellon exercised his lawful rights under the airport's prescriptive easement, the Town through Mr. Ventres and Ms. Merrow retaliated against and punished Mr. Mellon by misusing their state powers and offices to coerce him to give the parking to the GOH on the GOH terms, parking which was the linchpin of the Town's economic revitalization plan. There can be no clearer case of deprivation of constitutional rights under color of state law.

## Argument

### There Are Numerous Issues Of Disputed
### Material Fact Which Preclude Summary Judgment

Defendants have styled their motion as a motion for summary judgment under Fed.R.Civ.P. 56. The motion, however, simply re-makes, _verbatim_, the arguments previously raised in defendants' prior motion to dismiss under Fed.R.Civ.P. 12(b) which was denied by the Court.[13] In denying defendants' motion to dismiss, the Court has already ruled that the amended complaint states viable claims for relief under 42 U.S.C. § 1983 for the deprivation of plaintiffs' property rights and procedural and substantive due process rights under the color of state law. The affidavits of Ms. Merrow and Mr. Ventres add nothing new to the case; they simply reiterate facts plead in the complaint – _i.e._, Mr. Mellon cut the trees, and so forth. The defendants have not made any new arguments or offered any new facts to in any way alter the Court's prior rulings.

I.    Plaintiffs Have Been Deprived Of Their Property Rights

The cease and desist order purports to prohibit plaintiffs from conducting any "regulated activity" on the property of Goodspeed Airport, including the cutting and trimming of trees. (Mellon Decl. Attachment E.) The order expansively defines "regulated activity" as follows:

---

[13] Compare:  Argument II of defendants' Summary Judgment Memorandum dated March 5, 2004, with Argument III.A of defendants' earlier Brief In Support Of Motion To Dismiss dated April 30, 2002.

> 'Regulated activity' means any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses ...

(Mellon Decl. Attachment E at p. 2.)

Thus, the plaintiffs have been deprived of their property rights to cut and trim the trees on the airport's own property and to conduct any activity on the property that falls within the expansive definition of regulated activity in the cease and desist order. These are constitutionally protected property rights under § 1983. Under both procedural and substantive due process, "property" is defined as including "the right of use and enjoyment for lawful purposes. In fact, the substantial value of property lies in its use." Browning–Ferris Industries v. City of Maryland Heights, 747 F. Supp. 1340 (E.D.Mo. 1990). "The right of an owner to devote his land to any legitimate use is properly within the protection of the Constitution." Harris v. County of Riverside, 904 F.2d 497, 503 (9th Cir. 1990). Accord, Corp. of Pres. of Church of Jesus Christ of Latter Day Saints v. Environmental Protection Com'n, 837 F. Supp. 413, 417 (M.D. Fla. 1993).[14]

In addition, the cease and desist order also purports to prohibit plaintiffs from conducting any regulated activity on the EHLT's realty including the cutting and trimming of trees. (Mellon Decl. Attachment E.) Thus, the cease and desist order purports to prohibit plaintiffs from exercising their rights under their prescriptive easement to cut and trim trees on the EHLT realty. This too deprives plaintiffs of constitutionally protected property rights as an easement in a property right under Connecticut law. Kelley v. Tomas, 66 Conn.App. 146, 783 A.2d 1226, 1235 (2001). Accord, Public Storage, Inc. v. Eliot Street Ltd. Partnership, 20 Conn.App. 380, 567 A.2d 389, 392, n.4 (1989).

---

[14] The issuance of the ex parte cease and desist order to prohibit the cutting and trimming of trees on the airport's own property is particularly outrageous, unwarranted and an abuse of process since Goodspeed LLC had cut the trees on its own property in September 1999, sixteen months prior to the December 2000 cease and desist order, with no IWWC permit and with Mr. Ventres' knowledge and approval.

Defendants implicitly admit that plaintiffs' easement is a constitutionally protected property right by "assuming" that the plaintiffs have the right to remove trees on EHLT property under state law. (Def. Mem. at p. 6.)

In moving for summary judgment, the defendants altogether ignore the cease and desist order's deprivation of plaintiffs' property rights pertaining to the land owned by Goodspeed LLC. On this ground alone, defendants' contention that plaintiffs have not been deprived of any property rights should be rejected. Instead, plaintiffs only address the deprivation of plaintiffs' property right to cut and trim trees on the EHLT realty and argue that "plaintiffs have not been deprived of that property interest because they went ahead and cut the trees and they continue to operate the airport." (Def. Mem. at p. 6.) This argument is specious; it ignores the cease and desist order's ongoing prohibition against plaintiffs conducting any regulated activity on the EHLT realty. The cease and desist order deprives plaintiffs of their prescriptive easement which is a quintessential property right under § 1983.

II.    <u>Plaintiffs' Procedural Due Process Rights Have Been Violated</u>

The plaintiffs have been deprived of their procedural due process rights: (i) to notice and an opportunity to be heard in connection with the December 19, 2000 IWWC hearing; (ii) to have the record upon which the issuance of cease and desist order was decided to be a fair and accurate record untainted by misstatements and omissions of material fact encouraged and prompted by public officials; (iii) to have an unbiased IWWC tribunal free of conflicts of interest; (iv) to have the IWWC review the cease and desist order instead of simply ignoring it and leaving it in place; and (v) to have judicial review of the propriety of the issuance of the cease and desist order. Defendants altogether ignore all of these procedural due process violations in their summary judgment motion.

Defendants instead argue that plaintiffs "are being afforded due process" because defendants assert plaintiffs "had a post-deprivation remedy in the form of an appeals process set out in Connecticut General Statutes § 22a-43" and because "plaintiffs are currently defending the pending enforcement action in the Connecticut Superior Court." (Def. Mem. at pp. 6-7).

Contrary to defendants argument, plaintiffs had no appeal under § 22a-43 because the IWWC took no action on the cease and desist order and, in the absence of any decision, there was no right to appeal. Conn.Gen.Stat. § 22a–44(a) requires IWWC to hold a hearing on an ex parte cease and desist order and further requires that:

> The agency shall consider the facts presented at the hearing and within ten days of the completion of the hearing notify the person by certified mail that the original order remains in effect, that a revised order is in effect, or that the order has been withdrawn. The original order shall be effective upon issuance and shall remain in effect until the agency affirms, revises or withdraws the order.

Here, because the IWWC lacked a quorum free from conflicts of interest, the IWWC never held the required hearing, and, did not render any decision on the validity of cease and desist order. Instead, the IWWC terminated the hearing without taking any evidence and without reviewing the validity of the order. There was no decision of the IWWC affirming or revising the cease and desist order from which the plaintiffs could appeal. Conn. Gen. Stat. § 22a–43 cited and relied on by defendants only authorizes appeals from "decisions" of local IWWC's made pursuant to §§ 22a–36 to 22a–45. No such decision was ever made by the IWWC; it took the position it did not have a quorum, and, therefore, no meeting was ever held.

In addition, even if plaintiffs could have appealed to the Superior Court and overturned the IWWC's cease and desist order, such an appeal would not compensate plaintiffs for the injury they incurred by being subjected to the unlawful procedures and actions of the IWWC induced by the

defendants.  For example, in <u>Nasierowski Bros. Inv. Co. v. City of Sterling Heights</u>, 949 F.2d 890

(6th Cir. 1991), a plaintiff landowner alleged that his procedural due process rights were violated

when the city council, instead of affording the plaintiff a public hearing, convened in executive

session and reclassified the zone in which the plaintiff's land was situated.  The Sixth Circuit:

> [A] procedural due process claim is instantly cognizable in federal
> court without requiring a final decision on a proposed development
> from the responsible municipal agency.

*  *  *  *

> [I]f the claimed injury is the infirmity of the process, neither a final
> judgment nor exhaustion [of administrative remedies] is required.
> Conceptually, in the case of a procedural due process claim, the
> allegedly infirm process is an injury in itself ....

949 F.2d at 894.

Similarly, in <u>Corp. of Pres. of Church</u>, <u>supra</u>, the Court held that the plaintiff landowner, who

alleged that the local environmental protection commission violated procedural due process by

failing to follow the required rules in identifying wetlands on plaintiff's property, could maintain a

§ 1983 action even though the determination that wetlands existed on the property was withdrawn

after a final administrative hearing was held on the matter:

> Plaintiffs have suffered damages for a deprivation of property, albeit
> temporary, that is not compensable by simply withdrawing the
> government–imposed impediment.

837 F. Supp at 417.

Under the Supreme Court's decision in <u>Carey v. Piphus</u>, 435 U.S. 247 (1978), if this Court,

after trial, determines that plaintiffs were deprived of procedural due process in connection with the

<u>ex parte</u> cease and desist order, then plaintiffs are entitled at a minimum to the recovery of nominal

damages without proof of any actual injury:

> Because the right to procedural due process is 'absolute' in the sense
> that it does not depend upon the merits of a claimant's substantive
> assertions, and because of the importance to organized society that
> procedural due process be observed, we believe that the denial of
> procedural due process should be actionable for nominal damages
> without proof of actual injury.

435 U.S. at 266 (citations omitted). In <u>Carey</u>, the Supreme Court held that the plaintiff students, who

were suspended in violation of due process of law, were entitled to nominal damages even if they

incurred no actual damages because their suspension was justified.

In the instant case, there is also no merit whatsoever to defendants' suggestion that plaintiffs

have been afforded procedural due process because they are defending the Superior Court action

instituted against them. The Superior Court action has nothing to do with the <u>ex parte</u> cease and

desist order or with defendants' procedural due process violations in connection with the issuance of

the cease and desist order against plaintiffs.

III.    Plaintiffs Have Submitted Evidence Raising Genuine Issues of Material as to Whether
        <u>Defendants Violated Plaintiffs' Substantive Due Process Rights</u>

Count XIV of the Amended Complaint states a claim for violation of substantive due process

based upon the defendants' use of governmental authority for the ulterior motives to coerce plaintiffs

to provide parking to the GOH, to force plaintiffs to give up property rights to the GOH, to arbitrarily

interfere with plaintiffs' use of their own property, and to arbitrarily interfere with plaintiffs'

prescriptive easement on the EHLT realty. The defendants argue that plaintiffs have failed to

establish a substantive due process claim because they contend that substantive due process only

protects against governmental action that is " 'conscience shocking' in a constitutional sense." This is

the exact same argument defendants made in their earlier motion to dismiss under Fed.R.Civ.P. 12(b)

which the Court denied. This argument ignores the multitude of land use cases which hold that

plaintiffs have stated substantive due process claims without ever referring to "conscience shocking" conduct.

In T.S. Haulers, Inc. v. Town of Riverhead, 190 F.Supp.2d 455 (E.D.N.Y. 2002), for example, the Court upheld a § 1983 for the violation of substantive due process based upon allegations that the Town had arbitrarily denied the contractor a special use permit to mine sand on its property, not on the merits, but because of political pressure from certain private groups. 190 F.Supp.2d at 462. Similarly in Brady v. Town of Colchester, 863 F.2d 205 (2nd Cir. 1988), cited by defendants, the Court held that the District Court erred in entering summary judgment against a landowner's substantive due process claim:

> [T]he plaintiffs may be able to prove that they were denied a permit and use of their property not because of a good faith mistake on the part of the CPZC about the applicable law, but because of indefensible reasons such as impermissible political animus.

863 F.2d at 216.

Numerous other cases hold that substantive due process is violated when governmental authority is used in an arbitrary or irrational manner against a landowner for ulterior purposes. See, Walz v. Town of Smithtown, 46 F.3d 162 (2nd Cir. 1995) (substantive due process precludes town from denying landowner a water connection permit in order to coerce the landowner to convey certain land to the town); Marks v. City of Chesapeake, Va., 883 F.2d 308 (4th Cir. 1989) (substantive due process precludes city from denying landowner a conditional use permit based upon personal or illegitimate political motives).

In the instant case, there is evidence that the defendants misused state authority and state process against plaintiffs in order to further the private interests of the GOH and in order to coerce plaintiffs to provide parking to the GOH, and to force plaintiffs to give up property rights to the

GOH, and to deprive plaintiffs of their rights to use their property in a lawful manner. This arbitrary and irrational use of governmental authority to further private interests gives rise to plaintiffs' § 1983 claim for violation of substantive due process.

Defendants mis-rely on Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32 (1st Cir. 1992), the only land use case cited by the defendants. There, the Court affirmed the entry of summary judgment against a substantive due process claim because the record evidence established that a planning board's denial of a permit for a hazardous waste dump was based on the merits and not for an ulterior motive. In contrast, in the instant case, there are numerous genuine issues of disputed fact as to the motives and intentions behind the defendants' use of state authority and state process against plaintiffs.[15]

### Conclusion

For all of the foregoing reasons, plaintiffs Timothy Mellon and Goodspeed Airport LLC respectfully request that the Court deny the motion for summary judgment of defendants Ventres and Merrow.

Respectfully submitted,

Timothy C. Moynahan, #09880
Moynahan Minella Broderick & Tindall
P.O. Box 2242
141 East Main Street
Waterbury, CT 06702
(203) 573-1411

---

[15] Lowrance v. Achtyl, 20 F.3d 529 (2nd Cir. 1994), also cited by defendants is irrelevant. There, the Court held that prison officials did not violate an inmate's substantive due process rights by imposing a two day administrative confinement on the inmate for disobeying a guard's order and thereby creating a threat to the security of the prison.

_____

John R. Fornaciari, #04653
Robert M. Disch, #04654
Sheppard Mullin Richter & Hampton, LLP
1300 I Street, N.W., 11th Floor East
Washington, D.C. 20005
(202) 218-0000

Attorneys for Plaintiffs

DATED:  April 12, 2004